UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 5:19-CR-50-DCR-MAS-1 |
| ) | |
| LAWRENCE WESTBROOK, III, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant Lawrence Westbrook, III's ("Westbrook") Supplemental Motion to Suppress. [DE 65]. The Hon. Danny C. Reeves referred the initial matter to the undersigned for a Report and Recommendation. [*See* DE 35 (Motion to Suppress); DE 8 (Referral Order)]. The United States responded to the Motion [DE 37], and Westbrook filed a reply. [DE 40]. The Court held an evidentiary hearing at which the parties presented witnesses and arguments through counsel. [DE 43]. The Court issued a Report and Recommendation, denying Westbrook's motion. [DE 47].

Westbrook was subsequently arraigned on a superseding indictment. [DE 48 (Superseding Indictment); DE 61 (Arraignment)]. As a result, the District Court denied the original Motion to Suppress as moot. [DE 54]. Westbrook is now re-submitting said motion for the Court to consider on the merits. [DE 65]. The superseding indictment did not alter the facts or analysis of the previously issued Report and Recommendation. Thus, for the reasons stated below, the Court recommends again that the District Court deny Westbrook's Motion to Suppress.

1

## I. FACTUAL BACKGROUND

Westbrook's motion discusses two, different police encounters. Because the legal issues concerning each encounter are distinct, the Court will address each separately.

### A. JUNE 23, 2018 TRAFFIC STOP

On June 23, 2018, Lexington Police Officer Jacob Webster ("Webster") was conducting "proactive patrols" in an area with recurrent "narcotics activity." [DE 35-1, at Page ID # 110]. Around 2:00 a.m., Webster observed a vehicle pull into the Waffle House parking lot, a female exit the vehicle, enter the Waffle House, and then return to the vehicle within "a few minutes." [*Id.*]. Given the area and time of night, Webster suspected possible drug activity. [*Id.*]. The vehicle then drove to a Motel 6, the female exited the vehicle, and the vehicle left quickly afterwards without the female. Webster claimed this Motel 6 was also a frequent site of narcotic activity, thus raising his suspicion further. [*Id.* at Page ID # 111]. At this point, Webster began to follow the vehicle. While Webster felt he was "building reasonable suspicion," he hoped to find probable cause to investigate his intuitions. [Transcript at p. 7]. While following the vehicle, Webster witnessed the driver fail to appropriately use his turn signal twice in a short distance, and subsequently activated his overhead lights to conduct a traffic stop.[1] [DE 35-1, Page ID # 111].

Westbrook was the sole occupant of the vehicle. Upon approaching Westbrook, Webster asked if Westbrook "knew why I pulled you over." [DE 42, Webster Body Camera, at 0:00-2:30]. Westbrook, while also talking to someone on his cell phone, said he did not. [*Id.*]. Westbrook immediately told him of his two infractions, specifically identifying the two location where Westbrook failed to use his turn signal. [*Id.*]. Upon being told of his infraction, Westbrook

---

[1] It is at this point Webster's body camera footage is turned on. According to Webster, the camera is usually activated not immediately upon observing a suspect, but instead once the officer is about "come into contact" with the person. [Transcript at p. 8-9].

apologized, provided identification, and blamed the caller for distracting him from using his turn signal. [*Id.*].

Webster claimed that he noticed the "plain smell of marijuana" during this first contact with Westbrook. [DE 35-1, Page ID # 111]. Once another officer arrived, Webster confronted Westbrook about the smell. [DE 42, Webster Body Camera, at 5:45-6:30]. Westbrook claimed he had not smoked, but it could be "vapor" from someone who recently used the car. [*Id.*]. Westbrook was asked to step out the car so it could be searched. Westbrook agreed and commented that he also smelled marijuana, but he maintained he "did not smoke." [*Id.* at 10:15-10:30]. Upon the search of Westbrook's vehicle, Webster found a black bag on the driver's side floorboard containing a firearm as well as suspected methamphetamine, suspected marijuana, digital scales, baggies, two cell phones, and additional firearm magazines. [*Id.*]. Westbrook was subsequently arrested for suspected drug trafficking and possession of a firearm as a previously convicted felon.

**B. AUGUST 31, 2018 ARREST AT MIYAKO'S**

After his arrest, Westbrook was released on bail, but shortly after indicted on state charges related to the incident. [DE 37, at Page ID # 127]. On the above date, officers identified Westbrook's vehicle and Westbrook at Miyako Sushi & Grill on Richmond Road in Lexington. [DE 35-2, at Page ID # 120]. Rather than arrest Westbrook inside the restaurant, Officers chose to make the arrest as Westbrook exited the restaurant "in hopes of avoiding any kind of violent encounter." [*Id.*]. Leaving the restaurant with his wife and child, Westbrook was immediately apprehended and then searched incident to the arrest. [*Id.*]. Police found suspected methamphetamine, suspected marijuana, various pills, and $1,170.00 in cash on Westbrook's person. [*Id.*]. According to Detective Samuel Clements ("Clements"), officers intended to sweep Westbrook's vehicle via a narcotics K-9 sniff. [Transcript at p. 43]. The narcotics found on

3

Westbrook's persons, however, were inadvertently placed on the vehicle, making it impossible for the K-9 sniff to differentiate the scent of any narcotics that might be in the vehicle. [*Id.*].

While Clements determined his next step, an Officer Terry ("Terry") approached Westbrook to request consent to search the car, asking, "Is there anything in there that shouldn't be in there?" [DE 42, Davis Body Camera at 9:45-9:55]. Westbrook refused to respond or provide consent for Terry to search the vehicle, asking that he just be taken to jail. [*Id.* at 9:55-10:30].

Meanwhile, Clements proceeded to use a flashlight to do a "plain view" search of the vehicle. [*Id.* at 14:30-15:30]. Finding nothing, Clements approached Westbrook several minutes after Terry finished questioning Westbrook and acknowledged that Westbrook was not providing consent to search his car. [*Id.* at 15:30-16:30]. Clements then stated that officers will tow his vehicle to a secure location and apply for a search warrant. [*Id.*]. Westbrook inquired about whether his wife was going to be able to drive the car home from the restaurant. [*Id.*]. Clements said no. Westbrook then began to ask whether, if he consented to the search, the officers would allow Westbrook's wife to drive the vehicle home. [*Id.*]. Clements responded that "it just depends on what is located in the vehicle." [*Id.*]. Clements asked Westbrook if he has been read his *Miranda* rights, to which Westbrook respond in the negative. [*Id.* at 17:30-17:55]. As Clements began to recite said rights, Westbrook shook his head, stating "I know my rights". [*Id.*]. This was the first time in which Westbrook was read his *Miranda* rights on video.

From here, the prior conversation repeated. Clements explained that he was going to tow the car and apply for a search warrant; Westbrook asked, if he consented, if his family could leave with the car; and Clements confirmed they could if nothing illegal was found in the vehicle. [*Id.*]. Westbrook then asked to speak to his wife. [*Id.* at 22:15-24:00]. As they were speaking, Westbrook began asking questions to Clements, such as the legality of fireworks in the vehicle.

4

[*Id.*]. Clements responded that he had no interest in fireworks, just drugs and guns. [*Id.*]. Westbrook then revealed his wife had money in the vehicle as well as a firearm. [*Id.*]. Because officers knew Westbrook was a convicted felon, the officers then searched the vehicle. [Transcript, at pp. 50-51]. Seized from the vehicle was $11,200.00 and a firearm that was confirmed to be stolen. [DE 35-2, at Page ID # 120]. Westbrook was subsequently transported to the Lexington Police Department for further questioning and "questioned regarding his knowledge of narcotics trafficking and firearms, and provided a number of statements on the topics". [DE 37, at Page ID # 128].

## II.    ANALYSIS

Westbrook claims both encounters violated his Fourth Amendment rights. [DE 35, Page ID # 97]. Thus, Westbrook requests the suppression of all evidence and statements discovered as a result of the above-mentioned incidents. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) ("the exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of the unlawful search"). The Court will address each encounter below.

### A.    JUNE 23, 2018 TRAFFIC STOP

From the start, Westbrook concedes that Officer Webster had the right to search his vehicle upon the smell of marijuana. [DE 40, Page ID # 142]. Instead, Westbrook argues the traffic stop conducted by Officer Webster was a pre-textual stop, making it unlawful. But for the unlawful stop, Westbrook contends, law enforcement would have never found the narcotics, narcotics paraphernalia, firearms, etc. The Court disagrees.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "If the initial traffic stop was unlawful, the evidence and statements obtained

5

from the illegal stop must be excluded as fruits of the poisonous tree." *United States v. Warfield*, 727 Fed. Appx. 182, 185 (6th Cir.2018) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). It is the government's burden to prove that a traffic stop was justified. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). The subjective intent of an officer is not relevant in determining whether a traffic stop is unlawful or a Fourth Amendment violation. *Whren*, at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) ("If there is probable cause to believe a traffic violation had occurred, the officer's actual motivation is immaterial."); *United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002) ("A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct."). An officer's subjective intent, however, can be "relevant in assessing the credibility of the officer on the matter of whether an actual traffic violation was truly observed, or [if] there was no genuine traffic violation, and the stop was pretext." *United States v. One Million, Thirty-Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency*, 855 F. Supp. 2d 678, 692 (N.D. Ohio March 2, 2012) (citing *United States v. Freeman*, 209 F.3d 464, 467-68 (6th Cir.2000)).

Here, the determination of whether the stop was legal rests on the truthfulness of Officer Webster's testimony. Because "the only evidence that a traffic violation was committed" is Webster's testimony, Westbrook argues that the officer's "subjective intent is crucial in assessing the credibility of his claim that a violation occurred." [DE 40, at Page ID # 141]. Webster's testimony, however, was detailed and candid. Webster admitted that his initial following of Westbrook was based on a hunch, and that he was "starting to build reasonable suspicion of narcotic activity." [Transcript at p.7]. He also admitted, however, that he only felt it was "building", and that is why he "searched for a probable cause stop." [*Id.* at p. 15]. Webster detailed

the specific geographic area where he followed Westbrook and the two instances in which he saw Westbrook fail to use his turn signal. [*Id.* at 8].

The body camera, while not active to record the disputed traffic violations, provides corroborating evidence to Webster's account. Initially, while being pulled over, Westbrook fails to use a signal when turning into the gas station where he was stopped. [DE 42, Webster Body Camera at 0:01-0:45]. When Webster approaches, Westbrook is arguing on the phone, so much so that Webster must knock on the car window to get Westbrook's attention. [*Id.*]. Webster then not only identifies why he stopped Westbrook but describes with specificity the two traffic infractions. Westbrook, in response, apologized. [*Id.* at 0:45-1:15]. While this is not an admission of guilt, it also not a denial. This is further supported when Westbrook's blames the person on the phone for causing him to "not put [his] blinkers on." [*Id.* at 2:20-2:30]. The fact that the specific traffic violations are not caught on camera does not impact Webster's credibility.

In the end, the burden is on the government to establish that the traffic stop was justified, "'not unlawful[,] and [did] not violate the Fourth Amendment.'" Utilizing testimony, police reports, and body camera footage, Webster provided a credible and consistent narrative detailing how he had probable cause to initiate the traffic stop of Westbrook. As there is no issue concerning credibility here, Webster's subjective intent is immaterial, and the Court recommends that the District Court find the stop permissible.

## B.  AUGUST 31, 2018 ARREST

Turning to the arrest at Miyako's, Westbrook advances two arguments: (1) officers asked questions in order to elicit an incriminating statement from him before he was read his *Miranda* rights; and (2) the search of his vehicle was unlawful. [DE 40, at Page ID # 146; 148]. Because of these errors, Westbrook asks any statements made to law enforcement as well as any fruits of any search resulting from those remarks should be suppressed. Again, the Court disagrees.

7

Regarding the first issue, the *Miranda* safeguards are required when a suspect is taken into custody and "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "Any words or actions on the part of police […] that police should know are reasonably likely to elicit an incriminating response" can amount to interrogation. *Id.* Custodial questioning pre-*Miranda* can also be grounds to suppress post-warning statements if the "earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008). It is on United States to show by preponderance of the evidence to show the "voluntariness of a confession" or a "waiver of the auxiliary protections by *Miranda*". *Colorado v. Connelly*, 479 U.S. 157, 169 (1986) (citing *Lego v. Twomey*, 404 U.S. 477, 489-90 (1972)).

Neither party disputes that Westbrook was in custody on the night in question. Rather, the focus is on law enforcement's questioning of Westbrook, both by Terry and Clements. For Terry, the United States concedes that the questioning by Officer Terry of "is there anything in there that shouldn't be in there?" was interrogation. [Transcript at pp. 80-81]. It was pre-*Miranda* warnings and an attempt to elicit an incriminating response. As the United States notes, however, Westbrook did not respond with an incriminating response.[2] [DE 42, Davis Body Camera at 9:45-10:30]. The United States does not seek to introduce any evidence from this exchange at trial.

For Clements, nearly five minutes passed from when when Terry asked his questions and Clements began a dialogue with Westbrook. [*Id.* at 15:30-16:30]. Clements, after confirming that Westbrook had not provided consent to search the vehicle, explained to Westbrook that law enforcement intended to tow the vehicle to a secured location and apply for a search warrant.

---

[2] The United States noted the comments Westbrook made after, "I believe nothing illegal inside the vehicle, take me to jail", are less "incriminating and more exculpatory for the defendant", and "[i]f the defense wishes to suppress that statement, I'm not going to fight them on that."

Clements neither asked a question nor sought or implied to seek any additional information from Westbrook. Rather, it was Westbrook who then began questioning Clement about what circumstances would allow Westbrook's wife to leave in the vehicle. Although the statements by Clements were before Westbrook received his *Miranda* rights, the Court does not view them as interrogation.

After this conversation, Clement gives Westbrook his *Miranda* rights, to which Westbrook responds, "I know my rights." [*Id.* at 17:30-17:55]. Post-*Miranda* rights, Clements and Westbrook repeat the prior conversation, regarding the towing process and the possibility of Westbrook's wife driving the vehicle home if a consensual search occurs. [*Id.* at 17:55-18:45]. Again, the entire conversation is driven by Westbrook, not Clements. Westbrook is asking several questions trying to find an avenue that would allow his wife to leave with the vehicle. Clements is merely answering his questions. His answers do not seek or even suggest Westbrook should answer. During this conversation, Westbrook reveals there is a firearm in the vehicle. Thus, the first incriminating statement made by Westbrook is not only after he was given his *Miranda* rights, but also as part of a voluntary, spontaneous statement made during a conversation he initiated. The Court fails to see how Clements "elicited" the statement. Aware of the firearm, Clements then asks Westbrook where it is. [Id. at 23:00-23:40]. This is the first interrogatory question truly asked by Clements. The exchange is post-*Miranda* warnings, driven by Westbrook, and unrelated to the prior, pre-*Miranda* interrogation conducted by a different officer nearly 5 minutes before Clements first approached Westbrook. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008) (excluding incriminating statements made as part of a continuous questioning with the same officer on the same subject with no break in continuity).

9

Turning to the second issue, consent to a search vehicle must be given "unequivocally" and "not merely a response conveying an expression of futility in resistance to authority or acquiescing" an officer's authority. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). The United States concedes that Westbrook never provided consent. Barring consent, officers may search a "readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime" under the automobile exception. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *see also Smith v. Thornburd*, 136 F.3d 1070, 1074 (6th Cir. 1998). "Readily mobile" refers to vehicles "being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise." *United States v. Markham*, 844 F.2d 366, 368 (6th Cir. 1988) (quoting *California v. Carney*, 471 U.S. 386, 390 (1985).

Once Westbrook stated there was a firearm in his vehicle, the proverbial cat was out of the bag. Based upon their knowledge that Westbrook was a convicted felon and his statement, the officers had probable cause to search the vehicle for evidence of a crime—namely, the firearm. [Transcript at p. 50]. Westbrook's arguments fall short.

Accordingly, any pre-*Miranda* rights interrogation conducted by the United States did not lead to incriminating statements. Moreover, all post-warning statements were separate and distinct in time, persons, and content from those comments made by Terry. The incriminating statement made by Westbrook was a product of his own questioning and eventual conversation with his wife, not from questioning by law enforcement. The search of Westbrook's vehicle, triggered by his statements, was a legal, probable cause search under the automobile exception. Accordingly, the Court recommends the District Court deny the motion on these grounds.

### III. CONCLUSION

For reasons stated herein, the Court **RECOMMENDS** that the District Court **DENY** the renewed Motion to Suppress. [DE 65]. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b)(1), Fed. R. Crim. P. 59(b), and local rule, within **fourteen** days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

Entered this 1st day of July, 2019.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge